UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GREAT AMERICAN INSURANCE COMPANY,

        Plaintiff,

        v.                                   Case No. 21-cv-1018-bhl

R.J. SCHINNER CO. INC.,

        Defendant.

## DECISION AND ORDER

In early 2021, a flood caused extensive damage to a warehouse rented by Defendant R.J. Schinner Co., Inc. (Schinner) on the banks of Mill Creek in Nashville, Tennessee. Among other consequences, the flood left large amounts of Schinner's inventory, including paper, plastic, Styrofoam products, and other trash, scattered in and around the river and downstream properties. In this lawsuit, Schinner and its insurers argue over whether Schinner's insurance policies provide coverage for the clean-up costs. Three policies are at issue: (1) a Zurich American Insurance Company (Zurich) Property Insurance Policy (Property Policy); (2) a Zurich General Liability Policy (GL Policy); and (3) a Great American Insurance Company (GAIC) Excess Liability Policy (Excess Policy). All parties have moved for summary judgment, in full or part. For the reasons that follow, GAIC's motion will be granted, while Zurich's and Schinner's motions will be granted in part and denied in part.

## FACTUAL BACKGROUND

Schinner is a Wisconsin corporation that sells paper, plastic, and Styrofoam products as well as cleaning supplies on the redistribution market. (ECF No. 66 at 1–2; ECF No. 60 at 2.) In addition to its Wisconsin headquarters, Schinner maintains 18 warehouses nationwide. (*Id.* at 3.) The warehouse at the center of this litigation was located in Nashville, Tennessee, about 25 yards from Mill Creek, a tributary of the Cumberland River. (*Id.* at 4.)

Between March 27 and 28, 2021, Nashville experienced historic flash flooding that damaged over 500 homes and businesses and left six people dead. *March 27-28, 2021 Historic*

*Flash Flooding*, Nat'l Weather Serv. Nat'l Oceanic and Atmospheric Admin. https://www.weather.gov/ohx/20210327 (last visited December 1, 2023). Schinner's warehouse was among the infrastructural casualties. Mill Creek overflowed and toppled one of the warehouse's cinder block walls. (ECF No. 60 at 1.) Surging floodwaters then carried and scattered Schinner's inventory far downstream. (ECF No. 66 at 6–7.) This begat an "almost incomprehensible" debris field. (ECF No. 40-3 at 3.) Plastic coated every inch of the 20-foot trees lining the riverbank. (*Id.*) Pizza boxes, straws, and bags festooned miles of dense vegetation. (*Id.*)

On March 29, 2021, anticipating substantial remediation costs, Schinner's Vice President of Operations Michael Wentland contacted one of Schinner's insurers, Zurich. (ECF No. 66 at 6.) At the time of the flood, Zurich had issued Schinner two insurance policies: (1) a general liability policy with a $1 million per occurrence limit (the GL Policy) and (2) a first-party property insurance policy that included coverage for flood damage and debris removal (the Property Policy). (*Id.* at 3.)

Schinner was also protected by a GAIC excess liability policy (the Excess Policy), which provided $10 million of coverage in excess of Zurich's GL Policy. (*Id.*) For reasons that are not clear, Schinner did not notify GAIC of the flood damage until months later, on June 10, 2021. (ECF No. 61 at 2.)

Another interested party, the Metropolitan Government of Nashville and Davidson County (the Metro), had no need for notification. Shortly after the waters receded, Metro Councilmember Ginny Welsch contacted Wentland to discuss a sanitation plan. (ECF No. 66 at 9.) Wentland acknowledged the extent of the mess but did not commit Schinner to removing the debris, explaining that he needed to wait until he heard back from the company's insurers. (*Id.*)

Shortly thereafter, Zurich dispatched Vincent Barber to investigate. (ECF No. 61 at 2.) Based on Barber's assessment, Zurich agreed to indemnify Schinner under the GL Policy but made no determination as to the Property Policy. (ECF No. 66 at 11.) With coverage at least partially sorted, Schinner began its search for a waste management vendor willing to undertake the formidable cleanup job. Barber recommended Clean Harbors, Inc. (Clean Harbors) and helped negotiate a favorable discount. (*Id.* at 13–14.) Schinner took Barber's advice, and on June 7, 2021, Clean Harbors commenced work. (ECF No. 60 at 9.) This mostly involved bagging debris and sending it off to landfills, though some of the rubbish had settled along steep embankments, making retrieval a complicated, dangerous endeavor. (ECF No. 66 at 15; ECF No. 40-3 at 3.)

About two weeks into the job, on June 22, 2021, Clean Harbor's Director of Emergency Services T.J. Engstrom called Wentland and Barber with an estimate that the entire project would run about $1.8 million. (ECF No. 66 at 16.) This turned out to be optimistic; clean-up activity proceeded at a rate of $50,000 a day, and the cost soon ballooned beyond what Zurich's GL Policy would pay. (*Id.* at 18–19.) Thus, on July 8, 2021, with only about 20% of the work completed, Schinner instructed Clean Harbors to suspend activities pending coverage decisions on GAIC's Excess Policy and Zurich's Property Policy. (*Id.*)

As the insurers deliberated, the Metro took action. On July 27, 2021, Theresa M. Costonis, Assistant Metropolitan Attorney, mailed Wentland a letter threatening "to pursue all legal avenues available" unless Schinner promptly removed its spoiled inventory from Mill Creek. (ECF No. 54-14 at 3.) Schinner forwarded the letter to GAIC and Zurich and asked both to expedite their reviews. (ECF No. 66 at 19–20.)

GAIC finally responded on August 27, 2021, denying coverage for a number of reasons, including a pollution exclusion in the Excess Policy. GAIC also argued there was no "loss" within the meaning of the policy and that the voluntary nature of Schinner's cleanup effort precluded coverage. (ECF No. 60 at 14.) Zurich's decision took longer. On November 24, 2021, nearly eight months after the flood, Zurich indicated that it would extend coverage under the Property Policy but only for costs incurred within 1,000 feet of the warehouse. (ECF No. 66 at 21.) Zurich also satisfied Clean Harbors' outstanding balance under the GL Policy. (*Id.* at 22.) As of the date of this lawsuit, Zurich had paid out $1 million under the GL Policy and over $3.2 million under the Property Policy. (ECF No. 61 at 4.)

## LEGAL STANDARD

"Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the parties assert different views of the facts, the Court

must construe the record in the light most favorable to the nonmoving party. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

# ANALYSIS[1]

The parties' summary judgment briefing includes no small amount of crisscrossed finger-pointing as each seeks to foist the financial consequences of the flood and the resulting debris field onto someone else. For efficiency's sake, the Court will limit its discussion to the dispositive issues.

The Court begins with the basic premise of Wisconsin insurance law that insurance policies are interpreted using the same rules of construction that apply to other contracts. *Smith v. Atl. Mut. Ins. Co.*, 456 N.W.2d 597, 598 (Wis. 1990). Accordingly, the goal is "to ascertain and carry out the intent of the parties." *See Peace ex rel. Lerner v. Nw. Nat'l Ins. Co.*, 596 N.W.2d 429, 435 (Wis. 1999). This task starts (and often ends) with the parties' agreed-upon language. *See, e.g., Town Bank v. City Real Est. Dev., LLC*, 793 N.W.2d 476, 484 (Wis. 2010) ("[T]he best indication of the parties' intent is the language of the contract itself."). Because the insurer drafts the policy language that it offers to potential insureds, courts interpret a policy's terms from the perspective of a "reasonable insured." *Donaldson v. Urb. Land Ints., Inc.*, 564 N.W.2d 728, 732 (Wis. 1997). This is an application of the doctrine of *contra proferentem*. Thus, "ambiguities in a policy's terms are to be resolved in favor of coverage, while coverage exclusion clauses are narrowly construed against the insurer." *Id.* at 731.

Applying these maxims to the plain language of the policies at issue results in three conclusions: (1) GAIC is not liable because the Excess Policy's pollution exclusion plainly precludes coverage for clean-up of the debris field; (2) Zurich's Property Policy covers debris

---

[1] While the relevant insurance policies do not contain choice-of-law provisions, the parties agree that Wisconsin law applies. (ECF No. 39 at 5; ECF No. 42 at 13–14; ECF No. 52 at 8–9.) "When exercising diversity jurisdiction, a federal court must follow the choice of law rules adopted by the State in which it sits, including rules about whether stipulations as to choice of law are binding." *Flextronics Int'l USA, Inc. v. Sparkling Drink Sys. Innovation Ctr. Ltd*, 186 F.Supp.3d 852, 861 (N.D. Ill. 2016). "Wisconsin generally honors stipulations as to choice of law unless they conflict with public policy." *Skyrise Constr. Grp., LLC v. Annex Const., LLC*, 956 F.3d 950, 956 (7th Cir. 2020) (citing *Am. Fam. Mut. Ins. Co. v. Cintas Corp. No. 2*, 914 N.W.2d 76, 82 (Wis. 2018)). Because there is nothing unreasonable or antithetical to public policy about the application of Wisconsin law to this case, the parties' stipulation will control. *See Lloyd v. Loeffler*, 694 F.2d 489, 495 (7th Cir. 1982).

removal regardless of distance from the warehouse, but only up to $10 million; and (3) Zurich properly applied a $1 million deductible under the plain terms of its Property Policy.

I. **The Pollution Exclusion in GAIC's Excess Policy Bars Recovery for Schinner's Clean-up Costs.**

In its motion for summary judgment, GAIC advances three distinct justifications for its denial of coverage under the Excess Policy: (1) the Excess Policy's pollution exclusion; (2) the lack of a legal obligation to pay damages in connection with the cleanup effort; and (3) Schinner's alleged breach of the policy by incurring costs without GAIC's consent. (ECF No. 39 at 1.) Because the pollution exclusion applies, the Court need not examine GAIC's alternate theories.

While the basic grant of coverage under the GAIC Excess Policy would appear to embrace coverage for liabilities associated with the flood, that grant of coverage is subject to an endorsement, entitled "POLLUTION EXCLUSION – EXCEPTION FOR NAMED PERIL OF HOSTILE FIRE" (the Pollution Exclusion). Under this endorsement, coverage otherwise available is modified to exclude any loss arising out of or in any way related to: "[t]he actual, alleged, or threatened presence, discharge, dispersal, seepage, migration, release, or escape of 'pollutants,' however caused." (ECF No. 1-1 at 27.) The exclusion applies to "[a]ny request, demand or order" that any Insured "test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the effect of 'pollutants.'" (*Id*.) The endorsement defines "pollutants" as "any solid, liquid, gaseous, or thermal irritant or contaminant, including, but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste material includes materials which are intended to be or have been recycled, reconditioned or reclaimed." (*Id.*)

As an initial matter, the parties do not dispute that the debris at issue was the result of an actual "discharge, dispersal, seepage, migration, release, or escape." They also agree that Schinner received a "demand" that it "clean up or remove" the massive debris field of plastic and paper litter that covered the water, banks and trees along Mill Creek after the flood. Thus, the central issue concerns the meaning of the term "pollutants" and, more specifically, whether the items of Schinner's inventory that marred the riverbank fall within that term as defined in the endorsement.

The Court starts with the plain language of the policy and asks how that wording would be understood by a "reasonable insured." In other words, the question is whether a reasonable person or company in Schinner's shoes would consider the debris field littering the banks of Mill Creek to constitute pollutants as defined in the endorsement, which specifically includes "solid …

contaminant[s]" including "waste material."  To the extent there is any doubt, photos of the scene confirm the answer is yes.

 

(ECF No. 42 at 4.)  Putting financial consequences of the answer on the parties aside, it is hard to fathom how any reasonable insured would consider this scene to depict anything other than a river marred by pollutants.  The massive amounts of paper and plastic products blown from the warehouse and coating the river's banks and the surrounding vegetation are pollutants within both the normal meaning of the term and as defined in the endorsement.

This commonsense conclusion is consistent with the generally understood meaning of pollution.  The deposit of solid waste and plastics into and along our nation's waterways, like that shown in the photos, is a form of water pollution.  *See, e.g.*, *Water Pollution*, Wikipedia, https://en.wikipedia.org/wiki/Water_pollution (Oct. 5, 2023).  That the contents of the debris field are visible to the naked eye, or "macroscopic," does not render them any less pollutants than the unseen "microscopic" chemicals contaminating a river as a result of an accidental oil spill.  In determining whether a contaminant is a pollutant, size does not matter.

Application of the GAIC Pollution Exclusion to the Mill Creek debris field is also consistent with Wisconsin caselaw interpreting similar pollution exclusion provisions.  Wisconsin courts have been frequently called upon to interpret coverage exclusions for pollutants in a variety of settings.  *See Peace*, 596 N.W.2d 429; *Donaldson*, 564 N.W.2d 728; *Hirschhorn v. Auto-Owners Ins. Co.*, 809 N.W.2d 529 (Wis. 2012); *U.S. Fire Ins. Co. v. Ace Baking Co.*, 476 N.W.2d

280 (Wis. Ct. App. 1991); *Preisler v. Gen. Cas. Ins. Co.*, 857 N.W.2d 136 (Wis. 2014); *Langone v. Am. Fam. Mut. Ins. Co.*, 731 N.W.2d 334 (Wis. Ct. App. 2007).

Most recently, the Wisconsin Supreme Court discussed the application of a pollution exclusion in *Wilson Mutual Insurance Co. v. Falk*, 857 N.W.2d 156 (Wis. 2014). *Wilson Mutual* involved liquid cow manure that had leeched into neighboring well water. After confirming the general principle that an insurance policy must be interpreted from the view of a reasonable insured, the Court summarized its precedents as confirming that a reasonable insured would consider a substance a pollutant if "(1) the substance is largely undesirable and not universally present in the context of the occurrence that the insured seeks coverage for; and (2) a reasonable insured would consider the substance causing the harm involved in the occurrence to be a pollutant." *Id.* at 164, 167. The Court explained that whether a particular substance is a pollutant is heavily context dependent. Some substances, like carbon dioxide, are "universally present" and "generally harmless in all but the most unusual instances" and thus do not constitute pollutants. *Id.* at 167–68 (quoting *Donaldson*, 564 N.W.2d at 728). Other "unique and largely undesirable" substances, like bat guano inside a home, are pollutants because they would be "commonly understood to be harmful." *Id.* (citing *Hirschhorn*, 809 N.W.2d at 539). At the same time, other substances, like lead paint, are not a pollutant in some contexts, like when painted on a house wall, but can become a pollutant in other situations, such as when the paint flakes, chips, and is otherwise dispersed in a residential home, resulting in potential toxic lead poisoning. *Id*. (citing *Peace,* 596 N.W.2d at 447–48). Similarly, linalool, a valuable ingredient in fabric softener, is a pollutant when it finds its way into ice cream cones stored in the same warehouse. *Id.* at 169 (citing *Ace Baking*, 476 N.W.2d at 283).

Applying these principles, the Wisconsin Supreme Court reversed a Wisconsin Court of Appeals decision ruling that the manure at issue in *Wilson Mutual* was not a pollutant. The Court of Appeals had concluded that liquid manure was useful and a "normal and necessary" part of a dairy farm operation and thus "liquid gold" to a reasonable farmer, who would therefore not view it as waste or a pollutant. *Id*. at 163. The Wisconsin Supreme Court rejected this analysis, explaining that the Court of Appeals had ignored the context of the occurrence for which coverage was being sought. While the Court of Appeals was correct that liquid manure would not be a pollutant when spread on a farm field, it failed to account for the occurrence at issue, which involved the seepage of manure into the farmer's neighbor's well. *Id*. In the context of that

occurrence, the manure was "largely undesirable, commonly understood to be harmful, and . . . not universally present." *Id*. at 169. Thus, while a reasonable insured might not consider liquid manure a pollutant when applied to a field, it would consider manure a pollutant when present in a well. *Id*.

As explained in *Wilson Mutual*, the context of the insurance claim is key. Thus, the debris from Schinner's warehouse would not be a pollutant if it remained in the warehouse. But once it was washed away by the flood and scattered in and around Mill Creek it became a pollutant. In other words, while pizza boxes, straws, and bags are not pollutants when awaiting shipping in a warehouse, those same substances are pollutants when left on the banks of a waterway and when spilled into a river, caking its banks and nearby vegetation. Like manure or linalool, the products that make up the debris field have beneficial uses, but in the context of being strewn across land and water where they do not belong, they are pollutants.

Indeed, Schinner likens the debris removal to "picking up litter on a roadside." (ECF No. 58 at 3.) This comparison is apt and supports application of the exclusion. Littering causes pollution. Indeed, national public service campaigns have long been dedicated to stopping pollution, with a clear emphasis on littering. *See* Harald Fuller-Bennett & Iris Velez, *Woodsy Owl at 40*, Forest History Today, Spring 2012, at 22, 23 ("The film, an antipollution public service announcement, featured scenes of litter and pollution and ended with . . . 'Give a hoot, don't pollute.'"). Plastic pollution, in particular, is a widely recognized issue, with the United Nations Environment Assembly recently adopting a resolution to "develop an international legally binding instrument on plastic pollution . . . by the end of 2024." *World Environment Day Brings Solutions to Plastic Pollution Into Focus*, UN Environment Programme (June 5, 2023), https://www.unep.org/news-and-stories/press-release/world-environment-day-brings-solutions-plastic-pollution-focus.

Schinner insists that applying the pollution exclusion to losses like this will "lead to absurd outcomes," like a car crashing into a home or a building collapse being excluded from coverage by a pollution exclusion. (ECF No. 58 at 5.) This misunderstands the terms of the endorsement and Wisconsin law. Any loss caused by a car crashing into a home is not the result of pollution, despite the car being "undesirable and unnatural" in the home. Nor is damage caused by a negligently constructed house the result of pollution. No reasonable insured "would consider the substance causing the harm . . . to be a pollutant" in these contexts. "The reach of the pollution

exclusion clause must be circumscribed by reasonableness, lest the contractual promise of coverage be reduced to a dead letter." *Donaldson*, 564 N.W.2d at 732. That a substance is somewhere it does not belong does not necessarily render it a pollutant. But, where a substance both ends up in a place where its presence is harmful *and* where a reasonable insured would consider that substance to be a pollutant within the context of the damage caused, then the pollution exclusion applies. That is the case here.

The parties spend a considerable amount of time bickering over endorsement language confirming that "waste material includes materials which are intended to be or have been recycled, reconditioned or reclaimed." (*See* ECF No. 67 at 5–6; ECF No. 80 at 8–9.) The parties thus debate whether the debris can or was intended to be recycled. These arguments are misplaced. The relevant clause begins with the word "including," which confirms that the list that follows is non-exhaustive. *Liebovich v. Minn. Ins. Co.*, 751 N.W.2d 764, 772 (Wis. 2008). Thus, whether or not the debris can be recycled, will be recycled, or was ever intended to be recycled, is not dispositive on whether it qualifies as "waste material." Contrary to Zurich's contention, the fact that the flood itself "turned Schinner's inventory into waste," (ECF No. 67 at 6), also doesn't preclude it from being considered waste under the pollution exclusion. The case law cited above confirms that pollutants are evaluated at the time and in the context of the occurrence at issue. At the relevant time (following the flood), Schinner's inventory was undoubtedly waste material.

Zurich and Schinner's focus on GAIC's lack of investigation and the absence of expert testimony on the issue is similarly misplaced. The terms of the policy are evaluated from the standpoint of a reasonable insured. *Donaldson* 564 N.W.2d at 731. Neither GAIC's own investigation nor expert testimony are necessary or even relevant to that determination. The fact that Zurich declined to apply its own pollution exclusion to coverage, for whatever reasons, is similarly immaterial. (*See* ECF No. 58 at 3.) Zurich may have had its own commercial reasons for taking a different position, perhaps based on its own relationship with Schinner or its own discussions with its insured about its policy language. Regardless, Zurich's decision does not bind GAIC. Because the Court has concluded the debris is unambiguously a "pollutant" in the present context, coverage under the GAIC excess policy is excluded.

**II. Zurich's Property Policy Covers Schinner's Debris Removal Costs Without Regard to the Debris' Final Location, but Only Up to $10 Million.**

With respect to the Zurich Property Policy, Zurich and Schinner agree that the policy covers debris removal resulting from the flood. But they disagree on the scope of that coverage.

Zurich argues that the debris removal coverage is limited to debris that falls within 1,000 feet of the Schinner warehouse and only up to the policy's $10 million flood limit. Schinner contends that the Property Policy covers all debris removal, regardless of location, and up to the policy's blanket coverage limit of more than $86.4 million. Based on the plain terms of the policy, each party is partially correct. Schinner is correct that the policy covers removal of any debris that originated in the warehouse, regardless of where the debris finally settled. And Zurich is correct that debris removal coverage is confined to the policy's $10 million flood limit.

### A. The Property Policy Does Not Limit Debris Coverage to Schinner's "Premises."

As the parties acknowledge, the Property Policy covers debris removal. Under "Additional Coverages," the policy provides:

> We will pay your expense to remove debris of Covered Property, for which a Limit of Insurance is shown on the Declarations, remaining after a **"covered cause of loss"**. The most we will pay under this Additional Coverage for Debris Removal is the remaining applicable Limit of Insurance for the Covered Property shown on the Declarations after payment of the covered physical loss or damage.

(ECF No. 26-1 at 100.) "Covered Property" is defined as "the property that is insured for loss or damage under the applicable Coverage Forms or endorsements." (*Id.* at 59.) A "covered cause of loss" includes "a fortuitous cause or event, not otherwise excluded, which actually occurs during this policy period." (*Id.* at 71.)

Under "Excluded Causes of Loss" on the Real and Personal Property Coverage Form, "flood" is explicitly excluded from coverage. (*Id.* at 90.) The parties limited that exclusion, however, through a "Flood Coverage" endorsement that states: "The Flood exclusion does not apply to loss or damage at a "**premises**" at which a Limit of Insurance is shown on the Declarations for Flood." (*Id.* at 162.) "**Premises** . . . includes the area associated with that address in which you are legally entitled to conduct your business activities and includes that area extending 1,000 feet beyond the address." (*Id.* at 81.) Zurich and Schinner disagree over whether the policy covers the removal of *all debris*, including debris that, as a result of the flood, is no longer located on the "premises," meaning within 1,000 feet of the warehouse address.

The plain language of the policy provides that, in the event of a loss, Zurich will pay "to remove debris *of* Covered Property." (*Id.* at 100 (emphasis added).) At the time of the flood, the materials that now constitute debris were Schinner's inventory and that inventory was located

within the warehouse, a premises covered by the Property Policy. There is thus no dispute that the inventory was Covered Property within the meaning of the Property Policy. And under the Additional Coverages, Zurich promised to "pay [Schinner's] expense to remove debris of Covered Property," subject to the monetary limits in the policy. (*Id.*) Nothing in this debris removal coverage suggests that covered property that is destroyed and blown off the premises is excluded. Accordingly, the Court agrees with Schinner that it is entitled to debris removal coverage up to the applicable limit, regardless of how far the Covered Property was swept away from the warehouse.

Zurich parses its policy in an attempt to add a physical location limit to its debris removal coverage obligations. It cites the Real and Personal Property Coverage Form, which provides:

> We will pay for direct physical loss of or damage to **"real property"** and **"personal property"** at a **"premises"** directly caused by a **"covered cause of loss"**. We will not pay more in any one occurrence than the applicable Limit of Insurance shown on the Declarations for such loss of or damage to Covered Property at that **"premises"**.

(*Id.* at 89.)

According to Zurich, this language limits debris removal coverage to debris that is physically located on the "premises." Zurich insists that "all coverage provided by the Zurich property policy is 'premises' based." (ECF No. 52 at 12.) Zurich is partially correct. The Property Policy only covers loss or damage to real or personal property located at a covered "premises." Schinner's loss involved its inventory, which was undisputedly personal property located on a covered premises at the time of the flood. If the inventory had not been located on a covered premises at the time of the flood, Zurich would not be liable for loss or damage to the property. But that is not the case here; the inventory was in the warehouse when the loss occurred. The loss was therefore covered. Under the Real and Personal Property Coverage Form, in addition to covering the cost of that inventory, Zurich promised through the Additional Coverage for Debris Removal provision to cover Schinner's expenses to remove debris of Covered Property. Nothing in the additional coverage limits those expenses to debris that remained in close proximity to the warehouse. If Zurich wanted to impose such a limit, it could have done so. But the language of the policy does not contain such a limitation. No reasonable insured would expect that damaged

or lost property from a flood (or tornado) that left debris scattered off the warehouse premises would not be covered under the debris removal provision.

### B. The Limit of Insurance for Debris Removal is $10 Million.

The parties also dispute the applicable monetary limits of coverage for the debris removal. The grant of coverage provides, "[t]he most we will pay under this Additional Coverage for Debris Removal is the remaining applicable Limit of Insurance for the Covered Property shown on the Declarations after payment of the covered physical loss or damage." (ECF No. 26-1 at 100.) The applicable limit for loss or damage caused by a flood is $10 million. (*Id.* at 34.) Thus, under the plain terms of the policy, coverage for debris removal is $10 million minus any payment for physical loss or damage caused by the flood.

In an attempt to secure broader coverage, Schinner focuses on the policy's varying use of "loss or damage" and "expense." It contends that, because "the policy limit in the Flood Endorsement expressly applies to 'loss or damage' caused by a flood" and the debris removal provision "is for the 'expense' of debris removal," the flood limit does not apply. (ECF No. 42 at 22.) But this contention ignores the language of the debris removal provision, which specifically states that the covered amount of "expense" for debris removal is the "remaining applicable Limit of Insurance for the Covered Property shown on the Declarations after payment of the covered *physical loss or damage*." (ECF No. 26-1 at 100 (emphasis added).) The "expense" for debris removal that is covered is explicitly what remains on the applicable Limit of Insurance after payment for any loss or damage. Schinner asks the Court to ignore that the "covered cause of loss" that creates coverage for the debris removal was a flood—and the applicable flood limit is $10 million. Parsing the language of the policy to the extent requested by Schinner would do nothing more than create ambiguity where none exists. The debris removal is covered because it was the result of a flood. The flood limit is $10 million. Therefore, the limit of coverage for debris removal following the flood is $10 million.

### III. Zurich Properly Applied the $1 Million Deductible Under the Property Policy.

Finally, Schinner challenges Zurich's application of the deductible provision in the Property Policy. Under this provision, Zurich "will not pay for loss, damage, cost, or expense at any one '**premises**' in any one occurrence until the amount of covered loss, damage, cost, or expense exceeds the Flood Deductible shown on the Declarations for that '**premises**.'" (ECF No. 26-1 at 164.) The declarations for the Nashville warehouse show a $1 million deductible for

"Flood."[2]  (*Id.* at 34.)  Based on this language, Zurich deducted $1 million from its coverage payment before reimbursing Schinner under the Property Policy.

Schinner insists this deduction was improper.  Invoking Wisconsin's collateral source rule, Schinner argues that Zurich was obligated to apply a $998,111 recovery that Schinner received for debris removal under its separate GL Policy toward the required deductible under the Property Policy.  According to Schinner, the $988,111 payment from Zurich on the GL policy was akin to Zurich satisfying nearly the entire $1 million flood deductible associated with the Property Policy.  Thus, Schinner argues the deductible was paid by a "collateral source," which then triggered Zurich's obligations under the Property Policy.

In response, Zurich argues that the payment under its separate liability coverage has nothing to do with Schinner's deductible obligation under the Property Policy and the collateral source rule does not relieve Schinner of its duty to cover the first $1 million in debris removal expenses.[3]  The Court agrees with Zurich that it properly applied the deductible provision in the Property Policy and the collateral source rule has no application in these circumstances.

Wisconsin tort law has long recognized the "collateral source rule," under which "a personal injury claimant's recovery is not to be reduced by the amount of compensation received from other sources."  *Lambert v. Wrensch*, 399 N.W.2d 369, 372 n.5 (Wis. 1987).  But the rule exists to promote social responsibility, not clever accounting maneuvers.  Wisconsin "applies the . . . rule as part of a policy seeking to 'deter negligent conduct by placing the full cost of the wrongful conduct on the tortfeasor.'"  *Ellsworth v. Schelbrock*, 611 N.W.2d 764, 767 (Wis. 2000) (quoting *Am. Standard Ins. Co. v. Cleveland*, 369 N.W.2d 168, 172 (Wis. Ct. App. 1985)).  Zurich is not a tortfeasor.  It did not conjure the storm that ravished Schinner's warehouse and scattered its inventory.  No action this Court can take could deter it from invoking future severe weather events at its client's premises.

Schinner misreads Wisconsin caselaw to reach an alternate conclusion.  It tries to situate this case within the facts of *W.G. Slugg Seed & Fertilizer, Inc. v. Paulsen Lumber, Inc.*, 214 N.W.2d 413, 417 (Wis. 1974).  But the two actions bear little resemblance.  In *Paulsen*, the

---

[2] Schinner originally contested the deductible amount due to an alleged lack of notice when the amount changed from $100,000 to $1 million, but has now abandoned that contention.  (*See* ECF No. 61 ¶¶38–45.)

[3] Zurich also complains that Schinner has not adequately pleaded this collateral source argument.  But the Amended Complaint alleges that "Zurich paid $998,110.00 for removal of debris under the Primary Policy," and that "payment applies to any deductible."  (ECF No. 28 ¶¶22, 45.)  This is sufficient to put Zurich on notice of Schinner's argument.

defendant contracted to construct a habitable warehouse for the plaintiff. *Id.* at 415. It took liberties in the construction process and, as a result, proffered a defective building that quickly burned down. *Id.* Applying the collateral source rule, the Wisconsin Supreme Court rejected the defendant's attempt to reduce its liability by the amount the plaintiff received from his fire insurance policy. *Id.* at 417 ("[Defendant] is not entitled to the benefits of any insurance money as a collateral source to reduce its liability."). This demonstrates that the collateral source rule applies to wrongdoers in both breach of contract and tort cases. Zurich is neither. Squeezing an extra million out of its coffers will not deter future malfeasance. If anything, it will dissuade insurers from issuing multiple policies to a single insured, the very practice that Schinner relied on to avert financial catastrophe. Schinner must satisfy the deductible itself.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that GAIC's Motion for Summary Judgment, ECF No. 44, is **GRANTED**. GAIC has no duty to indemnify Schinner in connection with the cleanup and disposal of the flood debris caused by the March 27 and 28, 2021 flooding at Schinner's Nashville warehouse because the Excess Policy's pollution exclusion applies.

**IT IS FURTHER ORDERED** that Schinner's Motion for Summary Judgment, ECF No. 41, is **GRANTED**, **in part**, and **DENIED**, **in part**. Under the Property Policy, Zurich must cover Schinner's expense for removal of all debris from the March 27 and 28, 2021 flood, regardless of its proximity to the Nashville warehouse, up to the flood limit of $10 million. But Schinner is not entitled to the $998,111 it contends Zurich improperly withheld as a deductible.

**IT IS FURTHER ORDERED** that Zurich's Motion for Partial Summary Judgment, ECF No. 51, is **GRANTED**, **in part**, and **DENIED**, **in part**. Under its Property Policy, Zurich properly withheld a $1 million deductible from Schinner. But Zurich must pay, up to the Property Policy's $10 million flood limit, to remove any of Schinner's debris remaining from the March 27 and 28, 2021 flood, regardless of its proximity to the Nashville warehouse. And Zurich is not entitled to recover anything from GAIC because GAIC has no duty to indemnify Schinner under its Excess Policy.

**IT IS FURTHER ORDERED** that Zurich's Motion to File Under Seal/Restrict Documents that have been marked confidential, ECF No. 50, and GAIC's Motion to File Under Seal/Restrict Documents marked confidential, ECF No. 73, are **GRANTED**.

**IT IS FURTHER ORDERED** that all other claims are **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on December 1, 2023.

                                              s/ *Brett H. Ludwig*
                                              BRETT H. LUDWIG
                                              United States District Judge